| STATE OF NORTH CAROLINA | File No. 17CVS 375 |
|---|---|
| GASTON County | In The General Court Of Justice<br>☐ District ☒ Superior Court Division |

| Name Of Plaintiff | |
|---|---|
| Eric H. Otis | **CIVIL SUMMONS** |
| Address | ☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE) |
| 2320 Rose Garden Drive | |
| City, State, Zip | |
| Gastonia, NC 28056 | |
| **VERSUS** | G.S. 1A-1, Rules 3 and 4 |
| Name Of Defendant(s) | Date Original Summons Issued |
| Gatson County Schools, W. Jeffrey Booker, Dr. John Tutterow and Chris Germain | Date(s) Subsequent Summons(es) Issued |

**To Each Of The Defendant(s) Named Below:**

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Chris Germain | Dr. John Tutterow |
| 943 Osceola Street | 943 Osceola Street |
| P.O. Box 1397 | P.O. Box 1397 |
| Gastonia, NC 28053 | Gastonia, NC 28053 |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and
2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time ☒ AM ☐ PM |
|---|---|---|
| Eric A. Montgomery, Esq.<br>The Montgomery Law Firm, PLLC<br>6135 Park South Drive, Ste. 510<br>Charlotte, NC 28210 | 2/6/2017 | |
| | Signature Monica Michael | |
| | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time ☐ AM ☐ PM |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Signature | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.

(Over)

AOC-CV-100, Rev. 6/16
© 2016 Administrative Office of the Courts

```
STATE OF NORTH CAROLINA            IN THE GENERAL COURT OF JUSTICE
                            FILED    SUPERIOR COURT DIVISION
GASTON COUNTY                              17 – CVS – 398

                        2017 FEB -1  A 11: 27

ERIC H. OTIS,           GASTON CO., C.S.C.
                                    )
                    Plaintiff,      )
                                    )
                                    )
v.                                  )
                                    )
                                    )
GASTON COUNTY SCHOOLS,              )      VERIFIED COMPLAINT
SUPERINTENDANT JEFFREY              )             and
BOOKER, in his official and individual )   DEMAND FOR JURY TRIAL
capacities and DR. JOHN              )
TUTTEROW, in his official and       )
individual capacities, CHRIS        )
GERMAIN, in his official and        )
individual capacities               )
                    Defendants.     )
```

NOW COMES Plaintiff, Eric H. Otis (hereinafter "Plaintiff or Mr. Otis"), by and through his undersigned counsel, complaining of acts of the Defendants Gaston County Schools, Superintendant Jeffrey Booker, in his official and individual capacity, Dr. John Tutterow, in his individual and official capacity, Chris Germain, in his individual and official capacity, pursuant to Rule 3 of the North Carolina Rules of Civil Procedure (N.C. Gen. Stat. § 1A-1, Rule 3), alleges and states as follows:

## PARTIES

1. Plaintiff is a citizen of the state of North Carolina and a resident of Gaston County, North Carolina with a registered mailing address at 2320 Rose Garden Drive, Gastonia North Carolina 28056.

2. Defendant Gaston County Schools, upon information and belief, is a public school district and agent of Gaston County, with a registered mailing address at 943 Osceola Street, P.O. Box 1397, Gastonia, North Carolina 28053.

3. Defendant Superintendant Jeffrey Booker, upon information and belief, is a citizen and resident Gaston County and an agent of Gaston County Schools, with a registered mailing address at 943 Osceola Street, P.O. Box 1397, Gastonia, North Carolina 28053.

4. Defendant John Tutterow, upon information and belief, is a resident of Gaston County, Gastonia, North Carolina and an agent of Gaston County Schools with a registered

mailing address at registered mailing address at 943 Osceola Street, P.O. Box 1397, Gastonia, North Carolina 28053.

5. Defendant Chris Germain, upon information and belief, is a resident of Gaston County, Gastonia, North Carolina and an agent of Gaston County Schools with a registered mailing address at registered mailing address at 943 Osceola Street, P.O. Box 1397, Gastonia, North Carolina 28053.

6. Plaintiff timely filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), designated as EEOC Charge No. 430-2015-02115.

## JURISDICTION AND VENUE

7. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

8. This Court has personal and subject matter jurisdiction over this action and the parties of the dispute because all acts performed by the parties occurred and at all times material hereto, the parties reside and conducted business in Gaston County, North Carolina pursuant to N.C. Gen. Stat. § 7A-240.

9. Superior Court is vested with original jurisdiction for this action because the amount in controversy exceeds Twenty-Five Thousand Dollars ($25,000 USD), pursuant to N.C. Gen. Stat. § 7A-243.

10. Venue is proper in Gaston County pursuant to N.C. Gen. Stat. §§ 1-76 and 1-77 because the subject of this action is situated and the action arose in Gaston County, Gastonia, North Carolina.

## FACTUAL ALLEGATIONS

11. The allegations contained in paragraphs 1 through 10 are hereby re-alleged, re-asserted and incorporated herein by reference.

12. Defendant Gaston County Schools (hereinafter "GCS") has waived governmental immunity by the purchase of liability insurance as provided in N.C. Gen. State 160A-485.

13. Defendant GCS is liable as *respondeat superior* as to each of the state common law claims against defendants.

14. Plaintiff began his employment with Gaston County Schools on or about July 2012, as Dean of Students for Grier Middle School (hereinafter "Grier").

15. Plaintiff began his employment as a part-time coach at Hunter Huss High School (hereinafter "Hunter Huss") on or about February 2014.

16. In April of 2014, Torben Ross (hereinafter "Ross"), Principal at Hunter Huss, informed Plaintiff that he was creating a Dean of Student position and wanted Plaintiff to apply. Ross gave Plaintiff a description of the role and described the purpose of the role was to address student retention. Plaintiff was informed it would be an ideal position for him to fill because of his relationship with the community, his strong advocacy skills and mental health experience.

17. In April of 2014, Mr. Booker visited Grier to host an open forum with faculty and staff. During the session, Booker asked how he and his colleagues could help improve the school. Plaintiff candidly responded "give the kids a chance to succeed." There are several teachers who verbalized that they didn't want to teach here [at Grier Middle] If you would please allow the teachers that requested a transfer to leave, so that we can get teachers who want to be here and help our children." Following this incident, it became clear that Defendants would make it difficult for Plaintiff to work in the school system.

18. On or about July 7, 2014 Beth Suber (hereinafter "Suber"), Employment Relations Specialist with GCS Human Resources contacted Plaintiff to inform him that his position with Grier Middle School had been terminated. Ms. Suber asked if Plaintiff would like to be placed as a Dean of Students or go back into a Counselor position. Plaintiff informed Ms. Suber that he would like to Stay as a Dean of Students and asked to be placed at Hunter Huss as Dean after the position is approved. Ms. Suber informed Plaintiff that he would have to apply. Plaintiff learned the next day in a meeting with Grier Middle School Principal Loretta Reed, that she terminated the Dean of Students position because she learned of a position that was being created for Mr. Otis specifically at Hunter Huss by Mr. Ross and that Grier Middle School was given an additional assistant principal position by Mr. Booker.

19. On or about July 17, 2014 Plaintiff was informed that he was being placed at Carr Elementary School in Dallas, North Carolina. He would serve as a School Counselor. When Plaintiff called the Carr Elementary School Principal, Chris Germain (hereinafter "Germain"), it became apparent that Germain was not pleased to have Plaintiff as a staff member. When Plaintiff informed Germain he had been assigned to his school, Germain curtly replied "Well, when did you get placed here? ...Wow, it sure would be nice to hear from HR [about] who they're placing at my school." Mr. Otis continued to call and left messages for Ross about the Hunter Huss position, but Ross did not return his calls.

20. On July 17, 2014, the position at Hunter Huss was approved. However, Ross met with Mr. Booker the week prior to the approval of the position and was instructed by Superintendent Jeffrey Booker (hereinafter "Booker"), that he could not hire Plaintiff, despite his preference to do so.

3

21. On July 21, 2014 Plaintiff contacted Ross's office to inquire about the position at Hunter Huss and to inform him that the Plaintiff was placed at Carr Elementary. Ross was unavailable. Plaintiff went by Ross' office after football practice and inquired about the approval of the Dean of Student position at Hunter Huss and informed Ross that he was placed at Carr Elementary on July 17th at 4:38pm. Ross told Plaintiff that he was called into a meeting in June 2014 with Dr. Tutterow and asked by the Assistant Superintendant of Human Resources, Dr. Tutterow, (hereinafter "Tutterow") *"Why are you hiring so many black people at Hunter Huss?"* Ross replied *"Why would you ask me that question?"* Tutterow responded *"A school board member wants to know."* Ross asked Tutterow to identify the school board member, but he would not reveal the name. Ross further intimated that the Hunter Huss position had been approved on the morning of July 17, 2014, but he was told explicitly in a meeting the week prior by Superintendent Jeffrey Booker ("Booker"), that he could not hire Mr. Otis. Mr. Otis attempted to contact Tutterow to no avail and finally spoke with School Board Member, Chris Howell ("Howell"), a week later after Tutterow refuse to respond to the email Plaintiff sent requesting a meeting to address concerns Plaintiff had. Mr. Otis conveyed to Howell his concerns about the hiring process and the discriminatory nature of the comments from Booker and Tutterow and how those comments were factors into the decision to **not** hire him, even though he was Ross's desired candidate. Howell followed up with Ross, who confirmed his preference to hire our client and said he attempted to interface with the Superintendent personally about the hiring decision, but his efforts were unsuccessful.

22. Plaintiff reported to Carr Elementary for the 2014-2015 school year. From the outset of this school year, Plaintiff had a turbulent relationship with Germain where the two had several adversarial encounters because Germain regularly harassed Plaintiff and openly displayed his intent set Plaintiff up for failure at Car Elementary. Plaintiff was subjected to repeated issues with Germain and the staff, including:

    a. Beginning Sept. 2, 2014 Germain sent the Plaintiff an email asking *"What time are you leaving each day? Most of the work with families will occur after school hours. I think it is reasonable to ask you to stay at least until 3:30 or 4:00. This will not be a 7:00-3:00 type of job for you"*. Plaintiff responded and informed Germain that Plaintiff leave around 3:00 each day and arrive to work before 7:30 and is always on time. Plaintiff referred to Germain's statement in the August 18 meeting that staff had the option to work from 7:30-3:00 or from 7:45-3:15. Plaintiff chose to work from 7:30-3:00 because the Assistant Principal, Mr. McGuire asked him to do 7:30 morning duty. According to GCS, fulltime employees in Elementary Schools work from 7:45-2:40 daily.

    b. From August through November of 2014, Mr. Otis was unable to adequately review guidance materials and create lesson plans because of a defective desktop computer assigned to him and no access to a laptop. When our client raised this issue with Germain, his concerns were largely overlooked, but it was noted on his performance review that "lesson planning" was an area of improvement.

4

c. Germain emailed Mr. Otis with concerns from the School Improvement Team ("SIT") that several teachers had complained about missed guidance classes with our client; he responded that after sending out a monthly schedule to teachers his goal was to maintain consistency and make every effort to accommodate teachers even when they did not pick up their classes on time. He was also admonished for not answering email messages within a twenty-four hour time frame, even though the expectation was never conveyed to our client until his first performance review, approximately eight (8) months later.

d. After allegedly receiving staff complaints about Mr. Otis, Germain would not schedule follow-up meetings to address those concerns and improve our client's relationship with the teachers/staff at Carr. Mr. Otis asked in an email to meet with the teachers the next time they have a concern I order to address their concern appropriately. On another occasion during a review of Mr. Otis' observation for his PDP, Germain refused to meet with Mr. Otis and a teacher to ensure a healthy working environment.

e. Germain sent a highly critical email to our client after a teacher reported that she overheard Mr. Otis tell a fifth grade class that "Santa Claus was not real." No investigation was conducted; Germain assumed that Mr. Otis had used an improper example to a group of fifth grade students. If Germain had investigated the accusation, he would have learned that Mr. Otis used an example of Santa Claus in a lesson about honesty to teach students that every student's perception of Santa was different depending on where they lived, but he made no reference to the figure being real or imaginary. Mr. Otis was told in an email that *"I am worried that you may not be the right fit for elementary level students. Your skill set appears to be more middle or high school age appropriate."* Germain never investigated before accusing Mr. Otis and Germain had not observed Mr. Otis' skills to make that determination.

f. On January 14, 2015, Germain also sent a highly critical and demeaning email to the Plaintiff after the Plaintiff forwarded an email to him to review a possible presenter to do a Character Education presentation for the students at Carr called the NED Show. NED stands for Never give up, Encourage others and to Do your Best!

g. Mr. Otis was accused of using inappropriate language when he repeated the phrase "you suck" as an example with a group of students during a lesson activity. Germain had observed Mr. Otis during this lesson and appeared to understand the nature of the comment because it came from a student that expressed what was said to him by an adult, yet he never came to our client's defense or supported the activity when Mr. Otis was admonished during his performance review.

h. Germain put Mr. Otis under a Professional Development Plan ("PDP") in April of 2015. At the meeting to discuss the PDP, Germain told our client it was his belief that Mr. Otis was *"not a good fit for Carr;"* that he would never be successful

5

and Germain had discussed it several times with Tutterow during the year. Germain also stated that in his assessment, Mr. Otis did not do well with kindergartners and first grade students. Mr. Otis questioned Germain about his assessment because he had never observed him in a kindergarten or first grade classroom. Mr. Otis explained to Germain that he has supervisory experience in the area of Mental Health and part of his responsibility was to ensure that his counselors were properly trained, so they could improve any areas of weakness. Mr. Otis asked Germain: *"If you've been having conversations with Tutterow about me throughout the year and you thought that I was not going to be successful at Carr, then why didn't you provide me with opportunities, put measures in place or give me any guidance to help me be successful at Carr?"* Germain's response was: *"I don't know – I just didn't [support you]."* Mr. Otis told Germain that he felt like he was being *"set up for failure;"* Germain did not respond to this statement.

    i. While working as a School Counselor at Carr, Mr. Otis was harassed by Germain and set up for failure with significantly more duties and responsibilities than the previous Caucasian female counselor.

    j. In Mr. Otis's PDP discussions, Germain admitted that he did not take any direct action to help our client be successful at Carr.

23. On or about April 2015, Germain placed Plaintiff under a Professional Development Plan (hereinafter "PDP"). During a meeting to discuss the plan, Germain informed Plaintiff that he shared with Tutterow that Plaintiff *"was not a good fit for Carr; that he would never be successful,"* despite that fact that Plaintiff was given significantly more responsibilities than the previous Caucasian female counterpart and had not taken any action to help Plaintiff be successful at Carr.

24. On or About May 2, 2015, Mr. Otis received a visit from HR Employee Relations Specialist Beth Suber. Suber came because she received a call from Germain stating that *"Mr. Otis was not doing his job as a Counselor."* Mr. Otis was questioned by Suber and informed that she was investigating the allegations, that it's not good and she will get back to Mr. Otis within the next 48-72 hours.

25. Following this meeting, Plaintiff was administratively placed at McAdenville for the 2015-2016 school year. His counseling position at Carr Elementary was filled by two Caucasian female counselors.

26. Plaintiff again requested a placement at Hunter Huss, but Mr. Otis's name was never placed on the eligible candidates' transfer list that was sent to GCS principals. Moreover, the counseling position at Hunter Huss was filled by two Caucasian females with less experience than the Plaintiff.

6

27. Shortly before he was placed on PDP, on March 17, 2015, Plaintiff was contacted by Ross who requested that he attend a meeting at GCS Central Office to discuss the living arrangement of his nephew. Ross, Dr. Melissa Balknight (hereinafter "Balknight"), Superintendant of Student Support Services, and Mark Hollar (hereinafter "Hollar"), Assistant Superintendant of Operation Services, attended this meeting. During the meeting, Plaintiff was asked about his sisters living arrangements into the Hunter Huss school district. Plaintiff informed the group that his sister had asked him about moving into a specific apartment complex and wanted to know if it was within the Huss district.

28. Balknight then gave Plaintiff a signed statement written by the GCS Supervisor of Social Workers, Betty Worthy ("Worthy"), after a home visit to Deborah Bowden ("Bowden"). Upon information and belief, Bowden was a family friend of Plaintiff's wife, Africa Otis, who had agreed to let his sister and her two children live in her home temporarily until she could find a full-time job and apartment in late 2014. Worthy's letter recounted a statement allegedly made by Bowden that she *"did not know Mr. Otis's nephew (name omitted); he does not live with her and has never lived in her home."* The original statement was signed by Worthy. Plaintiff immediately denied the allegations in the letter presented by Worthy and stated that he had spoken directly to Bowden, who was distressed by her contact with Worthy at the home visit, because Worthy had alleged several times that Plaintiff was going to *"lose his job over this [issue of residency with his nephew]."* While in the meeting, Plaintiff asked the GCS Central Office Staff, Balknight, Hollar and Ross to let's go over to Mrs. Bowden's home together and have a conversation with her because he has nothing to hide. Balknight said that's not necessary.

29. After the Plaintiff left the meeting Shortly after the meeting, Worthy, Balknight, Hollar and Ross went to Bowden's home. Mrs. Bowden indicated that Africa asked if Plaintiff sister and her children can live with her temporarily until she find a fulltime job and that the Plaintiff was aware that his sister was not living there.

30. Upon information and belief, Plaintiff was terminated from his coaching position as a result of GCS forcing and intimidating Bowden with the threat of a misdemeanor criminal violation; Bowden signed a sham letter stating that Mr. Otis asked and directed her to falsify a residency affidavit, so his nephew could play sports at Hunter Huss.

31. Bowden was hired by GCS as a receptionist in exchange for her letter alleging that Plaintiff asked and directed her to assist him with providing her address for his nephew to attend Hunter Huss.

32. Plaintiff was terminated from his coaching position with the Hunter Huss football team when he met with Tutterow and Peppie Bullington ("Bullington"), on March 27, 2015. He was not given a termination letter at that time, but was told one would be mailed to him; he received an official letter of termination on April 4, 2015. According to Tutterow, Plaintiff was terminated for failing to report his nephew's correct address when he had direct knowledge of it; and asking a third party to submit a false residency affidavit, so that his nephew could attend Hunter Huss and play sports.

7

33. In the termination letter, Tutterow made reference to Plaintiff's job as a School Counselor: *"You are able to retain your School Counselor position with GCS, since it is a separate position from coaching. However, you will want to reflect upon your violations in light of your responsibilities and duties as a School Counselor since they contradict each other when advising and counseling students on ethical issues."* Although the termination letter stated his coaching position was separate from his counseling position, the letter noted that Plaintiff was lacking character and ethics when counseling students, and Germain was included in its recipients.

34. Upon information and belief, Dr. Tutterow sent Germain Mr. Otis's termination letter from his coaching position. As a result, Germain increased his efforts to give Plaintiff a negative evaluation with a PDP, so they could terminate him from his counseling position with Carr.

35. On April 7, 2015, Mr. Otis requested, in writing, copies of the minutes from his meeting with Dr. Tutterow and Ms. Bullington, a copy of Bowden's letter and asked that his written correspondence be placed in his permanent personnel record.

36. On or around May 8, 2015, Cynthia Howell (hereinafter "Howell"), Director of Human Resources, refused to allow him access to view the electronic copy of his personnel file. Howell produced a hard copy of his file that she had printed earlier, but it did not contain Worthy's or Bowden's statements and had no meeting minutes or the written request to Tutterow. When Plaintiff requested copies of the missing documents, Howell agreed to follow-up with Tutterow about the missing documents. She never contacted Plaintiff regarding the status of his file requests.

37. Defendants colluded to engage in discriminatory practices against Plaintiff, who is an African American. Plaintiff was severely reprimanded for his alleged recruiting efforts, while the East Gaston High School ("East Gaston") Head Football Coach, Sean Joyce ("Joyce"), whose race is Caucasian, was allowed to violate eligibility rules, without consequence and received support from a parent of one of his football players, the GCS Central Office, Mr. Booker Student Support Services, Dr. Balknight, and Principal of East Gaston, Dr. Bostic by manipulating a heavily-recruited student athlete and falsifying hardship documents, so the student could play football at East Gaston.

38. Beginning in December of 2014, Coach Joyce was allowed to recruit a student-athlete (name omitted), despite the student's failing grades and objections from both parents. At the time, the student lived outside the East Gaston School District; because he wanted to transfer to East Gaston from a Connecticut School District, he would have to be approved by the Gaston County Schools Central Office in order to enroll in any Gaston County School (per GCS policy).

39. Superintendant Booker was notified of the improper attempts to enroll the student into East Gaston, along with East Gaston Principal, Dr. Cristi Bostic ("Bostic"), and the Gaston County School District Office. Upon information and belief, the North Carolina

8

High School Athletic Association was made aware of the issues with the student, yet they allowed Joyce to play him without proper documentation.

## FIRST CLAIM FOR RELIEF
### [Disparate Discipline Based on Race and Gender]

40. The allegations set forth in Paragraphs 1 through 39 are re-alleged and incorporated by reference as if fully set forth herein.

41. Defendant GCS violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et sec. by negligently or with malice to apply disparate discipline against Plaintiff based on his race and gender on several occasions.

42. By reason of the conduct of Defendant GCS, Plaintiff has suffered emotional damage and injury, tremendous mental anguish and humiliation, and has lost the pay and benefits associated with the status of a coach in GCS.

43. Plaintiff is entitled to all of his lost benefits including, but not limited to back pay and front pay.

44. Plaintiff is entitled to reasonable attorney's fees, the costs and the expenses of this action and such interest as may be allowed by law.

## SECOND CLAIM FOR RELIEF
### [Failure to Promote and Retaliation]

45. The allegations set forth in Paragraphs 1 through 44 are re-alleged and incorporated by reference as if fully set forth herein.

46. At all times relevant hereto, GCS and Defendants Booker, Tutterow, and Germain had policy making and/or decision making authority in connection with the discriminatory employment actions and harassment suffered by Plaintiff.

47. Defendants violated 42 U.S.C. § 1981 when they discriminated against Plaintiff based on his race. Defendants did unjustifiably and without good cause take action adverse to Plaintiff in the manner described above.

48. The aforementioned conduct by Defendants was taken under color of State Law and directly and proximately caused the deprivation of Plaintiff's federally protected rights pursuant to 42 U.S.C. § 1981.

49. By reason of the conduct of Defendant GCS, Plaintiff has suffered emotional damage and injury, tremendous mental anguish and humiliation, and has lost the pay and benefits associated with the status of a coach in GCS.

9

50. Plaintiff is entitled to his lost benefits including, but not limited to back pay and front pay.

51. Plaintiff is entitled to reasonable attorney's fees, the costs and the expenses of this action and such interest as may be allowed by law.

52. As a direct and proximate result of the conduct, Plaintiff has been damaged. Such damages include:

    a. Plaintiff was denied employment during the 2015-2016 school year as a coach based on the conduct of Defendants Booker, Tutterow, and Germain.

    b. Plaintiff has lost credibility and suffered grave injury to his reputation among his colleagues and within the community based on the conduct of Defendants.

    c. Plaintiff was excluded from the privilege of being promoted to a Dean of Student at Hunter Huss, when he was not considered or placed on the eligible candidates' transfer list that was sent to GCS principals.

    d. Plaintiff suffered grave emotional and physical injuries as a result of the continued bullying and harassment of Defendants.

53. These sentiments may have been shared with the public at large or government officials.

54. This disparate treatment based on race was performed while Defendants were acting within the scope of their employment. Additionally, the racial discrimination that is the root of the disparate treatment exceeds the scope of Defendants employment and thus each of them are individually liable for their conduct.

## FOURTH CLAIM FOR RELIEF
[Confidential Information in Personnel File]

55. The allegations set forth in Paragraphs 1 through 55 are re-alleged and incorporated by reference as if fully set forth herein.

56. Through its agent, Howell, GCS had violated N.C. Gen. Stat. 126-24 by denying Plaintiff access to his complete personnel file.

## FIFTH CLAIM FOR RELIEF
[ Violation of N.C.G.S. §143-422 et.seq.]

57. The allegations set forth in Paragraphs 1 through 56 are re-alleged and incorporated by reference as if fully set forth herein.

58. The Defendants violated N.C.G.S. §143-422 et.seq. denying Plaintiff opportunities for advancement and by applying disparate discipline against Plaintiff based on his race and gender on several occasions.

59. By reason of the conduct of Defendants Plaintiff has suffered emotional damage and injury, tremendous mental anguish and humiliation, and has lost the pay and benefits associated with the status of a coach in GCS.

60. Plaintiff is entitled to all of his lost benefits including, but not limited to back pay and front pay.

## SIXTH CLAIM FOR RELIEF
### [Punitive Damages]

61. The allegations set forth in Paragraphs 1 through 60 are re-alleged and incorporated by reference as if fully set forth herein.

62. Pursuant to N.C. Gen. Stat. 1D, et. seq., Plaintiff contends that punitive damages are required to punish Defendants for their wrongful acts and to deter Defendants and others from committing similar wrongful acts.

63. Defendants did act intentionally, maliciously, willfully, wantonly and in reckless disregard to the rights of Plaintiff by aggressively bullying, harassing, defaming, and discriminating against Plaintiff through the specific actions described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court as follows:

1. Award compensation for loss of salary from the coaching position; and

2. Payment for the loss of administrative time from not being placed in a Dean of Students position; and

3. Punitive damages; and

4. Payment of attorney's fees; and

5. Future placement in a Dean of Students position; and

6. Return to coaching position at Hunter Huss or any comparable school within GCS; and

7. For a trial by jury on all claims so triable; and

11

8. For such other and further relief as the Court may deem just and proper.

Respectfully submitted this the 1st day of February, 2017.

THE MONTGOMERY LAW FIRM, PLLC

BY: _____
ERIC A. MONTGOMERY, N.C. Bar No. 38951
*Attorney for Plaintiff Eric H. Otis*
6135 Park South Drive, Suite 510
Charlotte, North Carolina 28210
Telephone: (704) 749-3135
Facsimile: (704) 749-3136
E-mail: eric@themlawfirm.com

12

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true copies of the foregoing **SUMMONS and VERIFIED COMPLAINT** were delivered to the persons listed below in accordance with the provisions of N.C. Gen. Stat. § 1A-1, Rule 4 of the North Carolina Rules of Civil Procedure by the sheriff of the county where service is to be made; by hand-delivery; or by registered or certified mail, return receipt requested, in a post office or official depository under the exclusive care and custody of the United States Postal Service, addressed as follows:

Served on:

W. Jeffrey Booker
943 Osceola Street
P.O. Box 1397
Gastonia, NC 28053

Dr. John Tutterow
943 Osceola Street
P.O. Box 1397
Gastonia, NC 28053

Mr. Chris Germain
943 Osceola Street
P.O. Box 1397
Gastonia, NC 28053

Gaston County Schools
Registered Agent
943 Osceola Street
P.O. Box 1397
Gastonia, NC 28053

This is the 1st day of February, 2017.

THE MONTGOMERY LAW FIRM, PLLC

BY: _____
ERIC A. MONTGOMERY, NC Bar No. 38951
*Attorney for Plaintiffs Eric H. Otis*
6135 Park South Drive, Suite 510
Charlotte, North Carolina 28210
Telephone:  (704) 749-3135
Facsimile:  (704) 749-3136
E-mail:     eric@themlawfirm.com

13

STATE OF NORTH CAROLINA

COUNTY OF GASTON

**VERIFICATION**

I, ERIC H. OTIS, declare:

1. I am the Plaintiff in the above lawsuit.

2. I have read the foregoing VERIFIED COMPLAINT. The allegations contained therein are true and correct to the best of my knowledge, except as to those matters and things stated upon information and belief; and as to those such matters and things, I believe them to be true.

I declare under penalty of perjury that the above is true and correct.

Executed on this the 1st day of February, 2017.

_____
ERIC OTIS

Sworn to and subscribed before me, by Eric Otis

this the 1st day of February, 2017

_____
Notary Public

ERIC A. MONTGOMERY
Notary Public, North Carolina
Mecklenburg County
My Commission Expires
May 12, 2020

Eric A. Montgomery
Printed Name

My commission expires: May 12, 2020

14